Filed 8/17/21 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>JOHNNY ALEXANDER LAPENIAS,<br><br>    Defendant and Appellant. | G060133<br><br>(Super. Ct. No. C1363271)<br><br>ORDER MODIFYING OPINION;<br>NO CHANGE IN JUDGMENT |

This court hereby orders that the opinion filed herein on July 29, 2021, be modified as follows:

1. On page 1, the superior court no. "H046359" is deleted and replaced with "C1363271."

This modification does not change the judgment.

MOORE, J.

WE CONCUR:

O'LEARY, P. J.

MARKS, J.*

*Judge of the Orange Super. Ct., assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 7/29/21 (unmodified opinion)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G060133 |
| v. | (Super. Ct. No. H046359) |
| JOHNNY ALEXANDER LAPENIAS, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Santa Clara County, Cynthia A. Sevely, Judge. Affirmed.

Sara H. Ruddy for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Jeffrey M. Laurence, Assistant Attorney General, Rene A. Chacon and Juliet B. Haley, Deputy Attorneys General, for Plaintiff and Respondent.

\*        \*        \*

Defendant Johnny Alexander Lapenias committed multiple sex offenses against his stepdaughter. However, Jane Doe did not disclose Lapenias' sexual abuse to the police until years later, when she was 14 years old.

At a jury trial, the trial court admitted expert testimony regarding Child Sexual Abuse Accommodation Syndrome (CSAAS), a theory that identifies typical behaviors of sexually abused children, including delayed disclosures. During the CSAAS expert's testimony, a juror asked: "Is it common for children to make up a story that abuse occurred, when, in fact it did not?" Over Lapenias' objection, the CSAAS expert testified: "No, that's rare." The jury later found Lapenias guilty of the charged sex offenses and the trial court imposed a life sentence.

On appeal, Lapenias challenges the admission of the CSAAS evidence, the related jury instruction, the CSAAS expert's testimony, and statutory fines and fees.

We find the trial court erred by allowing the CSAAS expert to testify that it is "rare" for children to make up stories about sexual abuse, but we do not find the error to be prejudicial, and we find no other errors. Thus, we affirm the judgment.

The Judicial Council encourages trial court judges to allow jurors to submit written questions to witnesses; this practice is not new or unfamiliar. (See Cal. Rules of Court, rule 2.1033 ["A trial judge should allow jurors to submit written questions directed to witnesses. An opportunity must be given to counsel to object to such questions out of the presence of the jury"].) Unfortunately, this court has recently seen a couple of instances, such as the one in this case, where a juror's question has led to the erroneous admission of objectionable testimony. If written questions are to be submitted by jurors—particularly when the questions are directed to expert CSAAS witnesses—we urge trial judges (and the parties) to carefully evaluate each question to determine if the answer may lead to unintended consequences.

2

# I

## FACTS AND PROCEDURAL BACKGROUND

Doe was born in 1997 (she was 20 years old at the time of Lapenias' trial in 2017). Until she was five or six years old, Doe lived with her biological father and her grandmother. Doe had very little contact with her biological mother (mother) until 2004, when Doe was six or seven years old. Doe then began staying with mother and her husband Lapenias, primarily during summer vacations and major holidays. Lapenias had several jobs, eventually becoming an addiction recovery minister. Lapenias and mother at some point started taking into their home people with recovery issues.

Lapenias committed various sex acts against Doe over a period of several years, all when Doe was 13 years old or younger, at four different homes.

In the summer before Doe was in the fourth grade, Lapenias and mother lived in a little cabin behind his parents' house in Oakland. Doe was on a couch in the living room with Lapenias lying behind her. Lapenias put his hand down Doe's pants and touched her vaginal area over her underwear. Doe "tried to roll over. He would just flip me back and continue."

The second incident happened at a two-story house in San Jose "with square pillars." Doe was in a downstairs closet in her pajamas looking for shoes. Lapenias picked Doe up by putting his hands under her armpits and around her ribs. Lapenias fell back onto a bed directly behind him. Doe landed on top of Lapenias. Lapenias had his hands under Doe's clothing, but over her underwear. Doe said, "this incident was really quick because my younger sister was in the door frame, because I had screamed when he lifted me, and I told her to run back to the living room so she couldn't watch." Doe was then "able to get up and run out of the room to check on her."

A third series of incidents took place over a period of years at a two story "house on a hill" in San Jose. When Doe would sleep over, she "would sleep upstairs with my mother in her bed or downstairs on the couch with him." Lapenias "would turn

3

on cartoons so I would feel comfortable. He would lay down next to me and wait a while until, I guess, he thought I was adjusted, and that is when he would start to molest me." Lapenias engaged in skin-to-skin contact by putting his fingers in Doe's vagina. Lapenias would ask Doe if she was "okay, if it feels okay." Doe would sometimes not respond, and sometimes she would say, "'Yes, I'm okay.'" Doe said these incidents eventually became commonplace and routine.

The final incident happened at "a recovery home" where Lapenias and mother took in people. Lapenias touched Doe in her vaginal area with his hands while they were on a couch, but Lapenias did not make skin-to-skin contact. Doe said it was "over my underwear, under my clothing."

*Doe's Disclosures*

Doe had known Payton B. since they were both in the second grade, and they were still close friends at the time of the trial. At some point, Doe disclosed to Payton B. that her mother's husband (Lapenias) was molesting her. Doe testified she told Payton in the fourth or fifth grade. Payton testified that Doe told her between sixth and seventh grade. According to Payton, Doe initially told Payton she was touched around her vagina and her chest, but about a year later, Doe said she was "full-on raped." Payton said that on both occasions when Doe disclosed, she was distraught, in pain, crying, and hysterical. Payton urged Doe to call the police, but Doe "didn't think anything would come of it." Doe instructed Payton not to tell anyone because she was embarrassed. Doe once told her school counseling group that she was being molested, which Payton testified she witnessed.

Doe did not tell mother about Lapenias' molestations because she was "scared" for her: "My mom has nothing unless she has someone and that's how it's always been. She has nothing unless she has someone by her side, and I don't know how she would have even felt if I did tell her." Doe said she "wasn't only afraid to tell my

4

mother because of what she would have dealt with, I was also afraid for the people that we started taking in." Doe explained, "I would have felt bad they would have all went back to the situations that they were in before. They came to live with us, and I didn't want that for them."

In September 2012, Doe was caught stealing makeup from a store. At that time, Doe disclosed Lapenias' molestations to her grandmother, who contacted the Clovis Police Department. In April 2013, San Jose Police Department Officer Martin Tracey and another officer interviewed Doe.

*Trial Court Proceedings*

The prosecution filed an information charging Lapenias with two counts of committing a lewd or lascivious act against a child under the age of 14 with force or violence, and five counts of committing an aggravated sexual assault on a child under the age of 14. The crimes were alleged to have occurred between January 1, 2004, and December 31, 2010. The information further alleged Lapenias had a prior strike conviction (assault with a firearm).

In October 2017, a jury trial took place. The prosecution called four witnesses: Doe, Payton, Officer Tracey, and CSAAS expert witness Dr. Blake Carmichael. Tracey testified that in July 2013, he had contacted mother who was still living with Lapenias (after Doe had disclosed the molestations).

On cross-examination, Lapenias' counsel confronted Doe with her prior statements. Doe did not recall telling police the first molestation happened at the house on the hill, and the second at the house in Oakland. Doe did not recall telling police she had disclosed to Payton almost immediately after the first molestation. Doe testified when she earlier said Lapenias had touched her more than 100 times, she meant it "felt" like more than 100 times. Doe admitted she knew her older sister had accused her stepfather (not Lapenias) of molestation and he was incarcerated as a result. Doe

5

admitted she told police she did not report Lapenias because it would break up her mother's relationship, and she feared the ministry residents would think she was lying because she did not want to live in the recovery home.

*CSAAS Testimony*

Dr. Carmichael is a child psychologist who testified as an expert witness. Carmichael said he was given no information and had no knowledge about the facts of the instant case. Carmichael testified CSAAS is a theory originally published in the early 1980's, which is designed to dispel common misconceptions about how kids experience and report sexual abuse. Carmichael said there are five components of the CSAAS theory: 1) secrecy; 2) helplessness; 3) entrapment or accommodation; 4) delayed and unconvincing disclosure; and 5) retraction.

Dr. Carmichael testified: "The idea of secrecy is that a perpetrator really relies on this happening in secret, where they will gain access to the child and then integrate sexual touch into that relationship." Carmichael said helplessness refers to the power imbalance between children and adults; "So if the child feels like they don't have someone they can tell or if they do know they can tell somebody but there would be negative consequence if they were to tell, that helplessness is even greater." Carmichael testified "entrapment and accommodation" refer to children feeling trapped in a sexual relationship, and they often accommodate the abuse, sometimes by disassociating from it. Carmichael said delayed or unconvincing disclosure is very common: "We look at disclosure as a process, not a single event. So kids may tell more events as they go along. They might tell different details to different people, and that's the process that we see kids go through." Carmichael testified sometimes after making a disclosure, an abused child will later deny that the abuse ever really happened (retraction).

Dr. Carmichael responded to written questions from jurors (this will be covered in more detail in the discussion section). Lapenias called no witnesses.

6

The jury found Lapenias guilty of the charged crimes. The trial court found the prior strike conviction to be true, imposed a total aggregate sentence of 182 years to life, and imposed certain fines and fees.

II

DISCUSSION

Lapenias contends the trial court erred by: A) admitting the CSAAS evidence, B) instructing the jury with CALCRIM No. 1193 (the pattern CSAAS jury instruction); C) allowing Dr. Carmichael to testify it is "rare" for children to make up stories about being victims of sexual abuse; and D) imposing statutory fines and fees. We shall address each of these contentions in turn.

A. *The Trial Court's Admission of the CSAAS Evidence*

A trial court's decision to admit evidence is reviewed for an abuse of discretion. (*People v. Brooks* (2017) 3 Cal.5th 1, 43.) There are varying degrees of deference within the abuse of discretion standard of review. (*Haraguchi v. Superior Court* (2008) 43 Cal.4th 706, 711-712.) A "trial court's findings of fact are reviewed for substantial evidence, its conclusions of law are reviewed de novo, and its application of the law to the facts is reversible only if arbitrary and capricious." (*Ibid*., fns. omitted.)

An appellate court cannot reverse a judgment based on the erroneous admission of evidence unless the admitted evidence "resulted in a miscarriage of justice." (Evid. Code, § 353, subd. (b).)[1] In a criminal case, a miscarriage of justice can only be found when the reviewing court determines it is reasonably probable that a result more favorable to the defendant would have been reached had the trial court excluded the

---

[1] Further undesignated statutory references are to the Evidence Code.

7

erroneously admitted evidence.  (See *People v. Lazarus* (2015) 238 Cal.App.4th 734, 787, fn. 53; see also *People v. Watson* (1956) 46 Cal.2d 818, 836.)

In this part of the discussion, we will:  1) review general legal principles regarding the admission of CSAAS evidence; 2) summarize the relevant proceedings; and 3) analyze the law as applied to the facts.

### 1.  General Legal Principles

"No evidence is admissible except relevant evidence."  (§ 350.)  "Except as otherwise provided . . . , all relevant evidence is admissible."  (§ 351.)  "'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness . . . , having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action."  (§ 210.)

Trial courts may admit CSAAS evidence to disabuse jurors of five commonly held "myths" or misconceptions about child sexual abuse.  (*People v. McAlpin* (1991) 53 Cal.3d 1289, 1300-1301.)  While CSAAS evidence is not relevant to prove the alleged sexual abuse occurred, it is well established in California law CSAAS evidence is relevant for the limited purpose of evaluating the credibility of an alleged child victim of sexual abuse.  (*People v. Mateo* (2016) 243 Cal.App.4th 1063, 1069; *People v. Perez* (2010) 182 Cal.App.4th 231, 245; *People v. Sandoval* (2008) 164 Cal.App.4th 994, 1001-1002; *People v. Wells* (2004) 118 Cal.App.4th 179, 188; *People v. Yovanov* (1999) 69 Cal.App.4th 392, 406-407; *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744-1745; *People v. Housley* (1992) 6 Cal.App.4th 947, 955-956; *People v. Harlan* (1990) 222 Cal.App.3d 439, 449-450; *People v. Stark* (1989) 213 Cal.App.3d 107, 116-117; *People v. Bowker* (1988) 203 Cal.App.3d 385, 393-394.)

## 2. Relevant Proceedings

Prior to trial, Lapenias filed a motion in limine to exclude the proffered CSAAS evidence. Lapenias argued, in part: "There are typically five areas of CSAAS possible testimony. Permitting evidence on all five areas without justification is not appropriate. Without some suggestion that one of the five 'myths' could be adopted by jurors, there is no need to receive testimony to rebut that particular myth. It is wholly irrelevant, and should also be excluded on 352 grounds."

The trial court conducted a pretrial hearing. The prosecutor argued, "I believe that as to secrecy, helplessness, entrapment and accommodation and delayed conflicting or unconvincing discloser, there will be evidence . . . and some inference that could be made that all four of those could apply to [Doe] and her sexual abuse why she chose not to tell." The prosecutor said, "I will make it very clear that the fifth category retraction does not apply to our case. . . . And the testimony in that area would simply be there are five categories."

The trial court denied "the request to exclude the testimony of Child Sexual Abuse Accommodation Syndrome. The Court does find . . . that the information is sufficiently probative to be admissible. And the Court does not find that the probative value is substantially outweighed by any prejudicial effect . . . ."

## 3. Application and Analysis

According to Doe's testimony, Lapenias began sexually molesting her sometime prior to when she entered the fourth grade, when children are typically nine or 10 years old. During this time, Doe largely did not attempt to resist. Further, Doe delayed reporting Lapenias' sexual abuse for several years, until she was about 14 years old. And while Doe was apparently consistent Lapenias had molested her on multiple occasions, Doe's cross-examination revealed she had been inconsistent as to the number of times it happened, and some of the details surrounding each event.

9

In short, the CSAAS evidence was relevant for the purposes of assessing Doe's credibility. (See § 351 [generally, "all relevant evidence is admissible"].) That is, the CSAAS testimony may have informed some jurors that Doe's apparent accommodation, helplessness, secrecy, and delayed disclosures were typical reactions among children who have been sexually abused. Given the evidence regarding Doe's reactions to her sexual abuse was, in fact, consistent with the proffered CSAAS evidence, we agree with the trial court that the CSAAS evidence was "sufficiently probative to be admissible." (Compare *People v. Clotfelter* (2021) 65 Cal.App.5th 30, 64-65 [admission of CSAAS testimony was found to be in error where there was no evidence that the "victims delayed reporting or recanted, and [defendant] did not question their credibility at trial"].) Thus, we find the court's admission of the CSAAS evidence was well within the bounds of reason and did not constitute an abuse of discretion.

Lapenias contends: "CSAAS testimony is no longer necessary because the public no longer harbors misconceptions about the behavior of sexually abused children." (Boldfacing omitted.) We disagree with Lapenias' assumption.

Lapenias' argument rests on a factual assertion (misconceptions about child sexual abuse are no longer present) that was not established prior to the trial court's evidentiary ruling. (See § 400 [a "'preliminary fact' means a fact upon the existence or nonexistence of which depends the admissibility or inadmissibility of evidence"].)

Further, while some prospective jurors in this case may have been aware of some aspects of CSAAS, it is not clear from the record that all the empaneled jurors were aware of the entire spectrum of CSAAS evidence (secrecy, helplessness, entrapment, accommodation, and recantation). Moreover, even if we were to assume that all the empaneled jurors were fully aware of all five components of CSAAS, we would then find Dr. Carmichael's testimony to be merely cumulative and therefore not prejudicial. (See *People v. Watson*, *supra*, 46 Cal.2d at p. 836 [defendant must show a reasonable probability of a more favorable outcome in the absence of the error].)

10

Lapenias also contends expert CSAAS testimony is inadmissible because it is unreliable under the *Kelly* rule.[2] He is mistaken.

The *Kelly* rule concerns the admissibility of evidence based on a new scientific method, which requires a showing the method is generally accepted in the relevant scientific community. (*People v. Shirley* (1982) 31 Cal.3d 18, 34.) The *Kelly* rule applies only to expert testimony "based, in whole or part, on a technique, process, or theory which is *new* to science and, even more so, the law." (*People v. Stoll* (1989) 49 Cal.3d 1136, 1156.) The *Kelly* rule applies only if "the unproven technique or procedure appears in both name and description to provide some definitive truth which the expert need only accurately recognize and relay to the jury. The most obvious examples are machines or procedures which analyze physical data." (*Ibid.*)

Here, the theory of CSAAS is not new. (See *People v. Bowker, supra*, 203 Cal.App.3d at p. 389, fn. 3 [CSAAS dates back to at least to 1983].) Further, CSAAS testimony does not purport to provide a definitive truth; rather, the expert testimony attempts to disabuse jurors of misconceptions they might hold about the conduct of children who have been sexually abused. In short, expert CSAAS testimony is not ""'scientific evidence"'" subject to the *Kelly* rule. (*People v. Harlan, supra*, 222 Cal.App.3d at pp. 448-449 ["The [*Kelly*] rule does not apply to [CSAAS] evidence"].)

Lapenias also contends: "The CSAAS evidence should have been excluded because any probative value was substantially outweighed by the likelihood the jury would misuse the evidence to infer guilt." (Boldfacing omitted.) We are not persuaded.

"The court *in its discretion* may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue

---

[2] "Formerly known as the *Kelly-Frye* rule, based on the rulings of *People v. Kelly* (1976) 17 Cal.3d 24 (*Kelly*) and *Frye v. United States* (D.C. Cir. 1923) 293 F. 1013, the rule is now the *Kelly* rule in California after changes to the Federal Rules of Evidence that superseded *Frye*." (*People v. Nieves* (2021) 11 Cal.5th 404, 442, fn. 8.)

consumption of time or (b) create substantial danger of *undue prejudice*, of confusing the issues, or of misleading the jury."  (§ 352, italics added.)

Evidence is not "prejudicial" merely because it is harmful to a criminal defendant's case.  (*People v. Megown* (2018) 28 Cal.App.5th 157, 164.)  Indeed, essentially all relevant evidence introduced by the prosecution is likely to be harmful to a defendant's case.  Evidence only creates "undue prejudice" if the evidence tends to evoke an emotional bias against the defendant, and the evidence has relatively little importance based on the specific issues involved in the particular case.  (*Ibid*.)  "The weighing process under section 352 depends upon the trial court's consideration of the unique facts and issues of each case, rather than upon the mechanical application of automatic rules." (*People v. Jennings* (2000) 81 Cal.App.4th 1301, 1314-1315.)

Here, the prosecution charged Lapenias with committing multiple sex crimes against his stepdaughter when she was under 14 years old.  From our perspective, the prejudicial impact of the relatively benign CSAAS testimony was likely to have paled in comparison to the charged conduct.  In any event, when analyzing for an abuse of discretion, we cannot substitute our discretion for that of the trial court.  (See *Shamblin v. Brattain* (1988) 44 Cal.3d 474, 478-479.)  The court made a reasoned judgment that the probative value of the proffered CSAAS evidence was substantially outweighed by any prejudicial effect.  (See § 352.)  Prior to its evidentiary ruling, the prosecutor informed the court about the anticipated evidence, and the court asked questions about the proffered CSAAS testimony.  The court plainly did not approach its ruling in an arbitrary or capricious manner.  Thus, we find no abuse of discretion.

Finally, Lapenias contends the trial court's admission of the CSAAS evidence violated his right to due process.  He is mistaken.

Generally, a court's compliance with the rules of evidence does not violate a defendant's right to due process.  (*People v. Hall* (1986) 41 Cal.3d 826, 834-835.)  Further, reviewing courts have routinely held the admission of CSAAS evidence does not

12

violate due process. (See, e.g., *People v. Patino* (1994) 26 Cal.App.4th 1737, 1744-1745 [a trial court's admission of CSAAS evidence did not violate due process]; see also *Amaya v. Frauenheim* (9th Cir. 2020) 823 Fed.Appx. 503, 505 [California court's ruling that the admission of CSAAS evidence did not violate federal due process was not contrary to, or an unreasonable application of, clearly established Federal law].)

In sum, we find the trial court did not abuse its discretion when it allowed the prosecution to introduce the proffered CSAAS evidence.

## B. The CSAAS Jury Instruction

Lapenias contends the trial court erred by instructing the jury with the pattern CSAAS jury instruction. (CALCRIM No. 1193.) We disagree.

We review instructional error claims under a de novo standard of review. (*People v. Fiore* (2014) 227 Cal.App.4th 1362, 1378.) "The proper test for judging the adequacy of instructions is to decide whether the trial court 'fully and fairly instructed on the applicable law . . . .'" (*People v. Martin* (2000) 78 Cal.App.4th 1107, 1111.) "The California jury instructions approved by the Judicial Council are the official instructions for use in the state of California." (Cal. Rules of Court, rule 2.1050(a).)

CSAAS evidence "is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation." (*People v. McAlpin*, *supra*, 53 Cal.3d at pp. 1300-1301.)

Here, the trial court slightly modified the Judicial Council's official instruction (CALCRIM No. 1193) to conform to the actual CSAAS testimony: "You have heard testimony from Dr. Blake Carmichael, Ph.D regarding child sexual abuse accommodation syndrome. [¶] Testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the charged crimes against

13

him. [¶] You may consider this evidence only in deciding whether or not [Doe's] conduct was not inconsistent with the conduct of someone who has been molested, and in evaluating the believability of her testimony."

Courts have held the pattern jury instruction accurately informs the jury on the limited use of CSAAS evidence, but the instruction does not: (a) improperly allow an alleged minor victim of sexual abuse to corroborate her own testimony; (b) violate due process; or (c) misapply the burden of proof. (*People v. Gonzales* (2017) 16 Cal.App.5th 494, 503-504; accord *People v. Munch* (2020) 52 Cal.App.5th 464, 473-474.)

We agree with *People v. Gonzales*, *supra*, 16 Cal.App.5th at pages 503-504, and *People v. Munch*, *supra*, 52 Cal.App.5th at pages 473-474. We similarly hold the official jury instruction accurately instructs the jury on the law: the proper use—and the proper limitations on the use—of CSAAS evidence. Thus, we find the trial court did not commit error by instructing the jury with CALCRIM No. 1193.

## C. The Scope of Dr. Carmichael's Testimony

Lapenias contends: "The trial court erred in permitting Dr. Carmichael to testify, over defendant's objection, that is was rare for children to make false claims of sexual abuse." (Boldfacing & capitalization omitted.) We agree, but we do not find the trial court's error to be prejudicial.

In this part of the discussion, we will: 1) review general legal principles regarding the admission of expert testimony; 2) summarize the relevant proceedings; and 3) analyze the law as applied to the facts.

### 1. General Legal Principles

"If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact;

14

and [¶] (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing . . . that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates . . . ." (§ 801.)

An expert witness may not give an opinion as to whether another witness is telling the truth, or whether the defendant is guilty. (*People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 81-83.) In *Coffman and Marlow*, a psychologist testified she believed an alleged victim told the truth during an interview. (*Id*. at p. 82.) The Supreme Court held that an objection should have been sustained. (*Ibid*.) "The general rule is that an expert may not give an opinion whether a witness is telling the truth, for the determination of credibility is not a subject sufficiently beyond common experience that the expert's opinion would assist the trier of fact; in other words, the jury generally is as well equipped as the expert to discern whether a witness is being truthful." (*Ibid*.) However, the Supreme Court did not find that error to be prejudicial. (*Id*. at p. 83.) "In sum, despite the admission into evidence of [the psychologist's] opinion concerning [the victim's] credibility, reversal is not required." (*Ibid*.)

"The erroneous admission of expert testimony only warrants reversal if 'it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error.'" (*People v. Prieto* (2003) 30 Cal.4th 226, 247; *People v. Bledsoe* (1984) 36 Cal.3d 236, 251-252 [applying *People v. Watson*, *supra*, 46 Cal.2d at p. 836, standard where evidence of rape trauma syndrome erroneously admitted to prove victim was actually raped].)

### 2. Relevant Proceedings

After the prosecutor concluded his direct examination, defense counsel chose not to cross-examine Dr. Carmichael. The trial court then read aloud written questions that had been submitted by individual jurors (after a sidebar discussion off the

15

record). One of the questions was: "Is it common for children to make up a story that abuse occurred, when, in fact it did not?"[3]

Over Lapenias' objection, Dr. Carmichael responded as follows:

"No, that's rare. There's research that talks about false allegations, and what I've been talking about is studies and experience with kids who we know have been sexually abused. Depending on the nature of the research, if you are looking at custody issues, rates of false allegations are higher, and those are typically advanced by the parent, not the child. So again, it's rare for kids to make a false claim of sexual abuse, even though those authors that talk about suggestibility and those kinds of concerns have written that most claims of sexual abuse are true. So it's not a common thing for kids to fabricate such a story."

After the jurors were excused for a break, Lapenias' counsel repeated his earlier objection for the record:

"The objection is that . . . this particular question from a juror is tantamount to asking the expert witness of whether or not Mr. Lapenias is guilty or not. That is not why Child Sexual Abuse Accommodation Syndrome experts are routinely called in these type of cases. That's not the method in which [the prosecutor] approached his examination of [Dr. Carmichael]. He was much more generalized, talking about the syndrome or pattern, generally not asking specific questions about this particular case. This question really, in fact, is a [veiled] attempt to get the expert to weigh in on whether

---

[3] There were four other questions asked by jurors that drew no objections: "Do you have an opinion about the child that does tell right away, what that means about their experience?" "Is it possible or common for kids to make contradictory claims of the sexual abuse that happened when they disclose to others or questioned by authorities?" "Is it strange for an abused child to volunteer or agree to be alone with the abuser?" "Following up to the contradictory questions, typically, who would they disclose more about the details of the incidents, to close ones or to authorities?"

or not Mr. Lapenias is guilty. For that reason, I find it is objectionable and not appropriately asked. Submitted."

The trial court stated the basis for its ruling: "So the court did feel it was relevant because he talked about delayed disclosures and again he knows nothing about this case, which he acknowledged. So I did feel it was appropriate. So I did allow the question to be asked over the Defense's objection."

During closing argument, defense counsel stated:

"One of the other things that Blake Carmichael said, and it was actually in response to a question submitted by one of you . . . and I don't remember the specific wording of the question -- but whoever asked the question is going to remember this. The answer was false allegations of child sexual abuse are uncommon." While not challenging Carmichael's opinion, defense counsel went on to argue Doe was likely not telling the truth because she did not like Lapenias.

During rebuttal closing argument, the prosecutor stated:

"Entrapment and accommodation. Why do you keep going back with this person? 'Because I trust him because he's my step-dad, because my mom tells me to trust him.' All of those things at that age group backed up by [Dr. Carmichael] who says that's what happens frequently and that's in the literature and that's what we see. . . . And as counsel said, almost never false allegations. Almost never. That's [from] the person who does this for a living."

### 3. Application and Analysis

Two relatively recent opinions have dealt with very similar facts: expert CSAAS witnesses who testified that children rarely lie about being the victims of child sexual abuse. (See *People v. Julian* (2019) 34 Cal.App.5th 878, 885-887 (*Julian*); see also *People v. Wilson* (2019) 33 Cal.App.5th 559, 570-571 (*Wilson*).)

17

In *Julian*, a CSAAS expert testified "false allegations of sexual abuse by children 'don't happen very often.'" (*Julian*, *supra*, 34 Cal.App.5th at p. 885.) The witness estimated "'*about as low as one percent of cases* to a high of maybe 6, 7, 8 percent that appear to be false allegations.'" (*Ibid*.) The Court of Appeal found the testimony to be inadmissible. (*Id*. at p. 886.) Quoting from an out-of-state case, the court reasoned: "'We believe the effect of the opinion testimony was to improperly suggest the complainant was telling the truth and, consequently, the defendant was guilty. We conclude the opinion testimony crossed that "fine but essential" line between an "opinion which would be truly helpful to the jury and that which merely conveys a conclusion concerning defendant's legal guilt."'" (*Id*. at pp. 886-887.)

In *Wilson*, after an expert witness had "testified about CSAAS, the prosecutor said: 'I want to step outside the accommodation syndrome briefly and talk to you about something we mentioned previously, false allegations.'" (*Wilson*, *supra*, 33 Cal.App.5th at p. 568.) The expert "then testified that there was a limited amount of research on the topic of false allegations of child sexual abuse, but that false allegations occur 'very infrequently or rarely,' most often during a child custody dispute." (*Ibid*.) The expert then cited studies indicating false allegations occur between one and six percent of cases. (*Ibid*.) The Court of Appeal held "that the clear weight of authority in our sister states, the federal courts, and the military courts finds such evidence inadmissible." (*Id*. at p. 570.) The court reasoned the expert's "testimony had the effect of telling the jury there was at least a 94 percent chance that any given child who claimed to have been sexually abused was telling the truth. And, although [the expert's] testimony on this point was not expressly directed to [the defendant's victims], the practical result was to suggest to the jury that there was an overwhelming likelihood their testimony was truthful. In so doing, this testimony invaded the province of the jury, whose responsibility it is to 'draw the ultimate inferences from the evidence.'" (*Ibid*.)

Here, we hold Dr. Carmichael's testimony that it is "rare" for children to make false allegations of sexual abuse was inadmissible.  Although Carmichael knew nothing about Doe and the facts of this case, his testimony—by implication and by inference—violated the general rule that an expert may not give an opinion as to whether another witness is telling the truth or the defendant is guilty.  (*People v. Coffman and Marlow*, *supra*, 34 Cal.4th at pp. 81-83.)  Further, applying *Julian* and *Wilson*, we find Carmichael's answer went considerably beyond the limited purpose of CSAAS evidence (to explain the typical behaviors of sexually abused children, such as delayed reporting).  Rather, the juror's question—and Carmichael's response—"'addressed whether children who claimed to be sexually assaulted lie.  [The] testimony did not aid, but supplanted, the jury in its decision on whether'" Doe's testimony was credible.  (See *Wilson*, *supra*, 33 Cal.App.5th at p. 569.)  Thus, the trial court's failure to sustain Lapenias' objection to the juror's question constituted error.

The Attorney General argues *Julian* and *Wilson* are distinguishable:  "those cases merely held that a CSAAS expert should not testify about the *statistical frequency* of false accusations of child molestation."  (Italics added.)  We disagree.

In *Julian* and *Wilson*, the CSAAS experts during their testimony did, in fact, attempt to quantify with statistics the rarity of false allegations by alleged victims of child sexual abuse.  However, we agree with Lapenias "there is no meaningful distinction between giving a statistic that indicates that false allegations are rare and stating that children rarely make false allegations without explicitly quantifying the word 'rare.'  The problem with both assertions is that [the] expert is vouching for the veracity of the" alleged victims.

We next consider whether Dr. Carmichael's erroneously admitted answer to the juror's question was prejudicial.  (See *People v. Watson*, *supra*, 46 Cal.2d at p. 836.)

Dr. Carmichael's testimony about false allegations of child sexual abuse was brief, as were the mentions of that testimony (by both counsel) during closing

19

arguments. Further, Doe's contemporaneous disclosures to Payton about being molested by her mother's husband (Lapenias) provided corroborative evidence of Lapenias' guilt. Additionally, the jury was also instructed that: "Testimony about child sexual abuse accommodation syndrome is not evidence that the defendant committed any of the crimes charged . . . . [¶] You may consider this evidence only in . . . evaluating the believability of her testimony." (CALCRIM No. 1193.) The jurors also received the standard evidentiary instructions that they were not bound by an expert's opinion, and that they were the sole judge of the credibility of the witnesses. (See CALCRIM No. 332 ["The meaning and importance of any opinion are for you to decide"]; see also CALCRIM No. 226 ["You alone must judge the credibility or believability of the witnesses"].) We presume the jurors understood and followed the instructions. (See *People v. Williams* (2000) 79 Cal.App.4th 1157, 1170-1171.)

In sum, we find it is not reasonably probable Lapenias would have received a more favorable result in the absence of Dr. Carmichael's erroneously admitted testimony about the rarity of false allegations of child sexual abuse. (See *Wilson*, *supra*, 33 Cal.App.5th at p. 572 ["we see no reasonable probability defendant would have achieved a more favorable result in the absence of the challenged testimony"].)

Lapenias argues the federal prejudice standard applies: harmless error beyond a reasonable doubt. (See *Chapman v. California* (1967) 386 U.S. 18, 23-24.) We disagree. In similar situations, our Supreme Court has applied the *Watson* standard. (See, e.g., *People v. Prieto*, *supra*, 30 Cal.4th at p. 247 [applying *Watson* standard where expert testimony was erroneously admitted]; see also, e.g., *People v. Bledsoe*, *supra*, 36 Cal.3d at pp. 251-252 [applying *Watson* standard where evidence of rape trauma syndrome erroneously admitted to prove victim was actually raped].)

Lapenias also argues cumulative prejudice. We disagree. In some cases, the cumulative effect of more than one harmless error may constitute prejudicial error when the errors are considered in the aggregate. (See *In re Avena* (1996) 12 Cal.4th 694,

772, fn. 32.) However, given that we have only found one error, and we did not find that error to be prejudicial, the doctrine of cumulative prejudice does not apply.

To reiterate and conclude, we hold the trial court erred by allowing Dr. Carmichael to testify in response to a juror's question that it is "rare" for children to make false allegations of sexual abuse; however, we do not find the error to be prejudicial.

## D. Fines and Fees

The trial court ordered Lapenias to pay $5,000 in attorney fees. The court further ordered Lapenias to pay other fines and fees: a $10,000 restitution fine, a $260 court security fee, a $210 criminal conviction fee, a $300 sex offender fine, and a $129.75 administration fee. Lapenias challenges these statutory fines and fees, but he did not object to any of them when they were imposed. Thus, Lapenias has forfeited his challenges on appeal. (See *People v. Williams* (1997) 16 Cal.4th 153, 250 [challenges generally cannot be raised for the first time on appeal].)

### 1. Attorney Fees

"If a defendant is provided legal assistance, either through the public defender or private counsel appointed by the court, upon conclusion of the criminal proceedings in the trial court . . . , the court may, after notice and a hearing, make a determination of the present ability of the defendant to pay all or a portion of the cost thereof." (Pen. Code, § 987.8, subd. (b).)

The California Supreme Court has held a defendant is precluded from challenging an order for attorney fees under Penal Code section 987.8 if the defendant failed to object in the trial court. (See *People v. Aguilar* (2015) 60 Cal.4th 862, 864; see also *People v. McCullough* (2013) 56 Cal.4th 589, 596-597 [challenge to a finding that defendant was able to pay booking fee was forfeited even though challenge was to the sufficiency of the evidence of the underlying finding].)

21

Lapenias concedes "that [the] failure to object to the imposition of fees such as those imposed here forfeits review of the sufficiency of the evidence to support the order on appeal." Nevertheless, Lapenias argues "the imposition of $5,000 in attorney's fees without a hearing on defendant's ability to pay the fees constituted ineffective assistance of counsel [(IAC)]."

Here, the record on appeal does not reveal why trial counsel may have decided not to object to the imposition of attorney fees (for instance, perhaps the attorney had additional knowledge regarding the true costs of his services, or the scope of his client's assets). Thus, Lapenias' IAC claim is more appropriately raised in a petition for a writ of habeas corpus. (*People v. Carter* (2005) 36 Cal.4th 1114, 1189 ["If the record on appeal sheds no light on why counsel acted or failed to act in the manner challenged," an IAC claim is more suitably raised in a habeas corpus proceeding].)

### 2. Various Other Fines and Fees

There has been a recent spate of challenges to fines and fees, mainly due to a 2019 opinion. (See *People v. Dueñas* (2019) 30 Cal.App.5th 1157, 1162 (*Dueñas*).) In *Dueñas*, an indigent defendant was convicted of driving without a license. The trial court imposed a $70 court facility assessment fee and a $150 restitution fine, over defendant's objection. The Court of Appeal reversed, holding the imposition of financial penalties violated due process unless the court first determined defendant's ability to pay. (*Id*. at p. 1164.) "Imposing unpayable fines on indigent defendants is not only unfair, it serves no rational purpose, fails to further [any] legislative intent, and may be counterproductive." (*Id*. at p. 1167.) The "additional, potentially devastating consequences suffered only by indigent persons in effect transform a funding mechanism for the courts into additional punishment for a criminal conviction for those unable to pay." (*Id*. at pp. 1168-1169.)

Here, unlike *Dueñas*, Lapenias did not object to any of the fines and fees. Further, the trial court imposed a restitution fine well in excess of the $300 statutory

22

minimum, and under the terms of the authorizing statute, the court could have considered Lapenias' ability to pay if he had objected and requested a hearing. (See Pen. Code, § 1202.4, subds. (c) [a defendant's inability to pay may be considered where fine exceeds $300 statutory minimum], (d) [in imposing fine in excess of minimum, court may consider the defendant's ability to pay; the defendant has burden to demonstrate inability]; see also *People v. Gutierrez* (2019) 35 Cal.App.5th 1027, 1033 ["even before *Dueñas* a defendant had every incentive to object to imposition of a maximum restitution fine based on inability to pay"].)

Lapenias did not object to the $10,000 restitution fine at the time of sentencing, nor did he request an ability to pay hearing. Thus, we hold that he forfeited any objection to the amount of the fine. We also hold that he forfeited his challenge to the other fines and fees. (See *People v. Gutierrez*, *supra*, 35 Cal.App.5th at p. 1033.)

The issue of whether a trial court must consider a defendant's ability to pay fines and fees is currently under review. (*People v. Kopp* (2019) 38 Cal.App.5th 47, review granted Nov. 13, 2019, S257844.) Therefore, we need not address the substance of the issue in detail. But even if we were to find Lapenias' challenge had not been forfeited, the facts in *Dueñas*, *supra*, 30 Cal.App.5th 1157, are distinguishable. In *Dueñas*, defendant experienced "cascading" and "devastating consequences" caused by the repeated imposition of fines and fees. (*Id.* at pp. 1163, 1168-1169.) This included the suspension of defendant's driver's license, which arguably resulted in her instant conviction for driving without a license. (*Id.* at pp. 1161-1162.)

Here, the record does not reveal Lapenias suffered any consequences due to the imposed fines and fees. Lapenias' crimes were certainly not the consequence of any previously imposed penalties. Thus, we find *Dueñas* to be largely inapposite.

23

III

DISPOSITION

The judgment is affirmed.


MOORE, J.

WE CONCUR:


O'LEARY, P. J.


MARKS, J.*

*Judge of the Orange Super. Ct., assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.